Wyly, J.,
dissenting. Article IS of the constitution provides that “ all persons shall enjoy equal rights and privileges upon any conveyance of a public character.” * * * * *
Act No. 38, of the acts of 18G9, an act to carry said article into *7 effect, provides in substance that, for certain causes, (such as improper conduct, infamous character, or refusal to pay the fare), all persons engaged in the business of common carriers shall have the right to refuse to admit passengers or to expel them from their steamboats or other water crafts, railroad cars or other vehicles; provided, they make no distinction on account of race or color. And for violating this provision, the party injured shall have the right to recover any damage, exemplary as well as actual, which he may sustain.
Assuming that the meaning of this legislation is that no colored person shall be excluded from the cabin and table of a steamboat, usually occupied by white passengers, and, if so excluded, he shall have the right to recover damages ou account thereof, the question is, were these enactments obligatory ou the steamboat Governor Allen, engaged in carrying passengers aud freight between New Orleans and Yicksburg, Louisiana and Mississippi?
Was the steamboat Governor Allen, engaged in commerce between the States under a license issued by the Uuited States, bound to observe this local or State legislation regulating the entertainment of passengers, requiring them to set at the same table aud occupy the same cabin ?
This legislation being in force, could the Governor Allen provide for her passengers two cabins aud tables affording equal accommodations, one exclusively for white passengers and. the other exclusively for colored passengers, aud having so provided assign each passenger to his proper place? ^
■ I speak not now of the right resulting from a contract, express or implied, between the passenger and the boat; because if the'boat contract to carry a colored passenger in the white cabin, and fails to do so, it will be responsible for a breach of that contract.
Such a contract would depend for its existence in no manner upon the legislation to which I have referred.
The inquiry is, has the State of Louisiana authority to make it unlawful for a steamboat engaged in commerce between the States, to provide separate cabins and accommodations for the white and colored passengers?
In my opinion she can not do so, without encroaching upon the power conferred by the constitution of the United States upon Congress, to regulate commerce among the States.
If Louisiana can require the passengers to be mixed, and make it unlawful for the whites to be assigned to one cabin and the colored to another, why may not Mississippi require.the white and the colored passengers to have separate apartments and make it a penal offense for them to be mixed in the same cabin 1
*8 If one State has jurisdiction on the subject, why has not the other?
If each have jurisdiction, each can pass just such laws as it deems necessary in the premises. Now what would be the consequence of such a state of affairs ? The result would be that the boat could carry no passengers. If it should carry passengers mixed in the same cabin, conformably to the laws of Louisiana, it would incur the penalty prescribed by Mississippi for mixing white and colored passengers.
If the States have authority to pass conflicting laws, which in effect would prohibit the transportation of passengers on steamboats from one State to the other, why may they not enact' similar laws in regard to freight ?
And if they can legislate upon the subject of passengers and the subject of freight, passing on steamboats between the States, are they not in effect regulating commerce among the States, in contravention of the constitution of the United States?
It was to prevent this very conflict of authority between the States, that the founders of our government wisely provided that Congress alone should have power to regulate commerce among the several States.
I can not regard the constitutional provision and the statute of this State, as applied by the majority of the court in this case, otherwise than as enactments of a State to regulate commerce between the States, in contravention of the constitution of the United States. They are in no sense enactments springing from the exercise of police power, because the police power of a State can not extend beyond its own limits. It can not be brought into activity to regulate commerce between the States, to prescribe how freight shall be carried or passengers accommodated upon steamboats running from one State to-another.
Having shown, as I think, conclusively, that the enactments of Louisiana, as applied in this case by the majority of the court, contravene the constitution of the United States, I think I may safely affirm that it was not unlawful for the Governor Allen to have two separate cabins and tables, one for the white and the other for the colored passengers, affording like accommodations to each; and in assigning each passenger to his proper place the captain or clerk committed no illegal act.
If there was no law prohibiting the universal custom of steamboats in this trade from having separate cabins for the white and colored passengers, that custom surely was not an unlawful custom.
I entirely agree with our learned brother below, that every custom must yield to positive law; and it was useless for the defendant to prove a custom contravening a prohibitory law.
But the precise question is, was the custom, which the defendant- *9 proved by overwhelming evidence to be universal among all the boats navigating the lower Mississippi, an unlawful custom; was it a custom in contravention of a prohibitory law 9
Laying out of view the enactments of Louisiana, which, I think, I have fully shown have no application to boats like the Governor Allen, engaged in commerce between the States, I boldly assert that the custom in question was not unlawful, that it contravened no prohibitory law.
Now let us examine the testimony of the witnesses in regard to the custom or regulation to which I have referred.
Thomas P. Leathers, a witness, says: I have been engaged in steamboating for the last thirty-six years; my principal trade has been between New Orleans and Vicksburg, Mississippi; have been running boats there for the last thirty-three years as master; I am now master of the steamer Natchez, a weekly packet between New Orleans and Vicksburg; was on the steamer Governor Allen when Mr. Washington came on board and applied for a passage for some person — -did not see who; heard the clerk of the boat tell him that if she was a colored person she could only be accommodated in the colored cabin ; think this was in July, 1872; the Allen was then running in place of my boat, the Natchez, carrying the mail; heard nothing more; this was Saturday evening before the boat backed out from the wharf; witness went with the boat to Carrollton; witness is familiar with the custom and regulation of steamboats carrying colored persons; it is usual to-have a colored cabin tor their accommodation, separate and distinct from all others; this custom is well kqown among all persons traveling upon the river, both white and black; it is a reasonable regulation, and prevails among all boats coming to this port; the colored passengers on my boat are accommodated as well as the white, and are provided with the same bill of fare, but distinct and separate apartments ; the rule on my boat is to keep the officers in a separate cabin; the waiters have a separate one; the ladies have a separate one; the gentlemen have a separate one; the ladies’ servants have a separate one, and the colored passengers another; each one is separate and distinct from the others, and have separate tables; the steamboat Governor Allen is regulated the same way my boat is regulated. This regulation and custom among steamboats coming to this port of keeping'the white and colored cabin passengers separate, has prevailed ever since I have been steamboatmg; I have never heard of any other; this regulation is made for the accommodation of the whole traveling community, because there are a large majority of white people who do not wish to be mixed up with the colored people, and the colored people do not wish to be mixed up with the white people; it would be *10 impossible to run a steamboat without tins regulation; it is just as essential as to keep the gentlemen and ladies’ cabin separate; I think the colored travel in my trade is between a fourth and fifth of the whole, that is, the white persons traveling are about four-fifths of the whole, or hear that; about one-half that travel is for pleasure; if I did not have rules and regulations for my boat, and accommodation of my passengers, I do not think I would have any, either white or colored; the white passengers are charged about twenty-five per cent, more than the colored, though they get the same accommodation ; Lieutenant Governor Dunn was a passenger on my boat j ust before his death; I gave him a state room in the colored cabin, where he preferred to be, as he asked for it; I have also had senator Revels travel on my boat, and he informed me that the separate cabin was the only way to give satisfaction to the white and colored race; that they must be kept separate; he was always accommodated in the colored cabin; I have also frequently had other colored members of the legislature, of both Louisiana and Mississippi, and always put them in the colored cabin, and never heard of any complaint from them on that score.
John W. Cannon, states in substance, that he is master and owner of the steamer R. E. Lee, and owner of her and the steamer Katie; that ho has been steamboating as master and owner for the last thirty-six years, in nearly all trades out of New Orleans, and has been in the Yieksburg and bend trade for the last fifteen or eighteen years, except during the war, making about a trip a week; that he is familiar with the custom of carrying colored passengers; that they are always carried separate and apart from the white people; that they were carried in the “nursery’’ until the boats got what was called the colored cabin, under the ladies’ cabin; that this regulation in regard to carrying colored persons is well known; that they are never carried in any other way; that since the war he has had the Quitman, the Grey Eagle, the Governor Allen, the Belle Lee, the Pargoud, the Magenta, the R. E. Lee and the Katie — all first class boats, with the exception of the Grey Eagle, and she was a comfortable passenger boat; that this regulation of keeping the colored and white passengers separate is well known to the traveling community, and is for the protection of their business; that white people would not travel on a boat if they knew negroes were put in the same cabin with them or even that they had stayed in the same state rooms where the white people would have to sleep after them, the prejudice in the public mind being so strong; that the colored passengers are treated the same as the white; they have the same food and attention; get their meals at the same time and have servants to wait upon them; that the Governor Allen has a *11 very comfortable bureau, and as good rooms as she has got above; there are some twelve or fourteen of them, and some very large ones ; that he has never known any boats to put-negroes in the cabin or at the white table; that they could not get along without observing this rule strictly; that the Lee generally carries from thirty to two hundred and thirty or three hundred passengers; has generally from seventy to eighty and one hundred; supposes about a third of them colored.
Captain John G. Benson, the defendant, states in substance, that he has been steamboating off and on since 1848, and for the last three or four years has been running in the New Orleans and Yicksburg trade; that the clerk of the boat came to him after the boat had backed out and said there was a woman on board of the boat disposed to make a little trouble if she could; that she was registered to get off at Hermitage Landing; that the passage of a white person to that landing was seven dollars and a colored person five; that there is a regulation on his boat to .keep the white and colored people separate, by having a cabin for the colored people separate from the white; that this is a regulation prevailing on the river; that the object of it is to protect a person in his business; that if a person-adopted any other, and allowed negroes to occupy rooms in the main cabin, he would not carry any other people; that this regulation is for the accommodation of the traveling public; that the average colored travel is from a fourth to a fifth of the white; that this regulation of keeping the colored people separate from the white is well known to the traveling community; that it has prevailed on the river since he has been on it; that he has a colored cabin on the steamer Governor Allen, called the “bureau,” where they get precisely the same attendance, food and accommodation as the white passengers, and are charged from a fourth to a fifth less.
A large number of witnesses were examined, and they all concur as to the universality of the regulation or custom prevailing on all the boats navigating the waters of the lower Mississippi, that white and colored passengers are accommodated in separate apirtments; and they state that this rule or custom was well known to the traveling public generally. This regulation was known to the plaintiff. Her counsel went to the clerk of the boat before the hour of departure to endeavor, in her case, to get him to vary from that custom, and to allow her to travel in the same cabin with the white passengers. This request was peremptorily refused. '
About the time, however, the boat was backing out, the plaintiff came aboard, and being refused accommodation in the white cabin she remained in the room known as the recess, in the rear of that cabin, during the trip, refusing to accept the accommodations tendered her in the colored cabin. Just before arriving at her place of destination *12 (the Hermitage Landing) the plaintiff went to the office and settled her fare, paying five dollars, the usual charge for colored passengers, the rate for white passengers being seven dollars.
Now, the question is, when the plaintiff went aboard the “Governor Allen,” as a passenger, in July, 1872, what was the implied contract arising between her and the boat or the defendant, the captain 9 Was the implied contract the securing of a passage in the white or colored cabin 1 In my opinion the contract was made in reference to the custom of that boat and all others carrying white and colored passengers. Entering that boat as a colored passenger, in view of the well known regulation referred to, the plaintiff tacitly consented to take accommodation in the colored cabin. And the obligation of the defendant was to furnish her as good a room and as good fare in that apartment as he gave to any passenger on the boat.
Now, the complaint is not that the accommodation in the colored cabin was not as good as it was in the white cabin (and the proof is there was no difference in the comforts of the two apartments), but it is because there was a discrimination on account of color, and the plaintiff was denied entertainment in the same cabin with the white passengers.
The basis of plaintiff’s action is a breach of contract, and on account thereof she claims damages to the amount of seventy-five thousand dollars. But the difficulty in her case is, she had no contract for passage in the same cabin with the white passengers, and being excluded therefrom, there was no breach of contract on the part of the defendant, and consequently there is no ground either for the amount of damages claimed by her or for the amount of $1000, awarded by the court a qua.
If the clerk of the boat, when applied to by the counsel of the plaintiff, had consented to give the plaintiff accommodation in the white cabin, and afterwards refused to allow her to occupy the same, there would be a strong ease in favor of the plaintiff to claim damages for breach of contract; and the authorities relied on by plaintiff, with so much confidence, to wit: St. Armand v. Lizardi, 4 La. 244, and Keene v. Lizardi, 5 La. 431, and 6 La. 319, would be applicable. Those authorities and that of Chamberlain v. Chandler, 3 Mason, 142, are correct expositions of the law most eloquently expressed, in regard to the responsibility of owners for the breach of duty by their officers, showing that they are responsible even for the mental suffering occasioned by the injustice and disrespectful and brutal conduct of said officers.
I fully indorse what is said in those cases, believing that part of the contract between the passenger and the boat or its owners, is an implied stipulation for the good conduct and proper behavior of their *13 officers. If there is a breach of contract in this respect or any other respect, damages may be claimed on account thereof.
If there be a breach of contract in the case at bar, of course the plaintiff can claim dainages. But if the custom or regulation in regard to the mode of carrying colored passengers to which I have referred, be not unlawful, on entering the boat as a passenger, the plaintiff impliedly accepted the defendant’s offer to carry colored passengers in pursuance of that regulation, and she impliedly consented to take accommodation in the colored cabin. The defendant held himself out as prepared to take colored passengers, subject to a certain regulation universally prevailing on all boats navigating the waters of the lower Mississippi 5 and when a colored passenger entered his boat, the “ Governor Allen,” the implied contract was that his passage should be in the colored cabin. When a white passenger entered it, the implied agreement was that he should be accommodated in the white cabin, and if denied accommodation in the colored cabin he could not claim damages for breach of contract. It was the duty of the defendant, however, to provide suitable accommodations, and to make'each cabin equally comfortable, and this he is shown to have done.
In conclusion, I maintain there was no breach of contract if the regulation of the boat was not unlawful, because that regulation formed part of the implied contract which arose between the plaintiff and defendant, in July, 1872, when she entered the boat as a passenger. Laying out of view the enactments of Louisiana, which are not applicable to boats engaged in commerce between the States, I find nothing in the common law, which is the law-of the United States, prohibiting boats from making regulations for the common benefit of all the passengers, from separating the white and the colored into different apartments, giving to each equal accommodations. This custom or regulation is proved to have existed at least for the last thirty years, and perhaps ever since the American people commenced to navigate the Mississippi river.
Congress, which alone has authority to regulate commerce among the several States, has not seen proper to enact a law making this custom or regulation unlawful, although the subject in the shape of the civil rights bill has been lately under its consideration. Until the lawgiver speaks, it is our duty to be silent. For this State to interpose its enactments, and for this court to apply them to a subject solely confided by the constitution of the United States to Congress, is a glaring usurpation of authority.
For the reasons stated, I deem it my duty to dissent in this case.
Rehearing refused.